**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| EXPRESS MOBILE, INC., | Civil Action No. 2:17-cv-00130-JRG-RSP (Lead) |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| SVANACO, INC., | |
| Defendant. | |
| BIGCOMMERCE, INC., | Civil Action No. 2:17-cv-00160-JRG-RSP (Consolidated) |
| Defendant. | |

**DEFENDANT BIGCOMMERCE, INC.'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

    A.    The Purported Invention of the Asserted Patents ....................................................1

    B.    The Prosecution History of the Asserted Patents.....................................................3

    C.    XMO Mischaracterizes the Nature of the Purported Invention ..............................4

II.   ARGUMENT.................................................................................................................7

    A.    Disputed Terms of the '397 and '168 Patents.........................................................7

        1.    "virtual machine": Claims 1, 2, 9, & 37 of '397 patent .............................7

        2.    "runtime engine": Claim 1 of '168 Patent .................................................11

        3.    "substantially contemporaneously": Claims 1 & 2 of '397 patent ............14

        4.    "contemporaneously": Claim 37 of '397 patent ........................................18

        5.    "multidimensional array": Claims 3 & 4 of '397; Claim 1 of '168...........21

        6.    "database": Claims 1-3, 9, & 37 of '397 patent; Claim 1 of '168
            patent.........................................................................................................22

III.  CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*,
No. 6:11-CV-011, 2012 WL 2872121 (E.D. Tex. July 12, 2012) .........................................15

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003)............................................................................................23

*AquaTex Indus., Inc. v. Techniche Solutions*,
419 F.3d 1374 (Fed. Cir. 2005)............................................................................................13

*Eibel Process Co. v. Minn. & Ont. Paper Co.*,
261 U.S. 45 (1923)................................................................................................................18

*Evicam Int'l, Inc. v. Enf't Video, LLC*,
No. 4:16-CV-105, 2016 WL 6470967 (E.D. Tex. Nov. 2, 2016).........................................15

*Felix v. Am. Honda Motor Co.*,
562 F.3d 1167 (Fed. Cir. 2009)............................................................................................24

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008)......................................................................................26, 27

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).................................................................................15, 17, 18

*Konami Corp. v. Roxor Games, Inc.*,
445 F. Supp. 2d 725 (E.D. Tex. 2006)..................................................................................18

*Medicines Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017) *and* '397 ............................................................................19

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005)............................................................................................13

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016)..............................................................................................21

*RLIS, Inc. v. Allscripts Healthcare Solutions, Inc.*,
No. 3:12-CV-208, 2013 WL 3772472 (S.D. Tex. July 16, 2013) .........................................18

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012).............................................................................................19

*U.S. Surgical Corp. v. Ethicon, Inc.*,

103 F.3d 1554 (Fed. Cir. 1997)................................................................................................18

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)...........................................................................................23

I.      INTRODUCTION

Throughout its opening brief, Express Mobile, Inc. ("XMO") takes a legally improper approach to claim construction.  Instead of focusing on what a person of skill in the art would have understood the terms to mean in view of the intrinsic record, XMO repeatedly resorts to the principle that, unless a term is explicitly defined or the patent unambiguously disavows claim scope, it may ignore the patentee's own statements about what he understood to have invented and advance constructions that omit elements its own expert agrees are inherent to the claim terms.  This approach contradicts the framework for claim construction established in *Phillips* and *O2 Micro*, and is disconnected from the patents-in-suit and their purported invention.

A.      The Purported Invention of the Asserted Patents

The asserted patents both claim priority to a December 1999 application and purport to provide an improved method for (1) building a website and (2) rendering it on an end-user's screen.  The patents criticize "conventional" website building applications that "operate on traditional operating systems" and thus "run on platforms other than the World Wide Web (WWW) and its browsers."  '397 patent at 1:10-29.  According to the patents, "conventional" applications were capable of offering only a "crude preview" of the web page being designed. *Id*. at 1:29-31.  The patents also criticize tools for encoding and rendering websites through the use of "conventional mark-up and scripting languages," such as "HTML (hyper text mark-up language) and Script Code (e.g., JavaScript)." *Id*. at 1:11-15.  Specifically, the patents note that such "mark-up and scripting languages include numerous inherent limitations." *Id*. at 1:11-21.

To overcome these limitations, the patents call for the use of a popular tool known as the Java Virtual Machine ("JVM"), which allowed programs written in Java to run on any operating

1

system.[1]  *See* '397 patent at 1:52-54; 35:34-38.  As of the asserted patents' priority date, Java had established itself "as the industry recognized language" for "programming the Internet."  ECF No. 78-5 at 8:12-14.  Unlike the "mark-up and scripting languages" criticized by the patent, Java was a "full featured programming language."  '397 patent at 1:16-21, 1:53-54.  And unlike other full-featured languages criticized by the patent, "such as C++ or Visual Basic," Java "support[ed] programming for the Internet in the form" of "small, specialized applications" called "Java applets" that execute directly "within a Java-compatible browser."  ECF No. 78-5 at 8:12-31; '397 patent at 1:23-31.

The Java-based "build tool" of the patents provides a "What You See Is What You Get" ("WYSIWIG") user interface, which displays the web page under construction and allows the user to create and manipulate its content using features typical of a standard Microsoft Windows Operating System interface.  *See* '397 patent at 17:26-34.  Thus, instead of writing HTML, the page designer places elements directly on a version of the final web page and manipulates them using a mouse and various menus.  *See* '397 patent at 5:48-53, Fig. 2.

When it comes time to distribute the website, the patent describes the website's contents as being created via: (1) a "run time engine"; (2) a database; and (3) an "HTML Shell File." '397 patent at 2:10-14, 2:36-42.  Figure 25 and the specification's accompanying text describes the generation of the "run time engine."  To create the run time engine, the invention begins with

---

[1] Although they share a common prefix, Java and JavaScript, they are not related to one another from a technical perspective. *See* Declaration of Christopher Schmandt ("Schmandt Decl.") ¶ 23; Ex. 1 at 52:11-16 (explaining that "JavaScript is not Java" and have "completely different" implementations).  JavaScript is a scripting language developed by Netscape that is interpreted by a JavaScript engine of a web browser, much like HTML is interpreted by a browser's rendering engine.  *Id*.  Java, on the other hand, is a full-featured programming language created by Sun Microsystems and used for developing programs that are converted into bytecode so that they can be executed on a JVM, *id*. ¶ 23, as discussed in further detail below.

the "run engine source code." *See, e.g., id.*, Fig. 25, Block 162; *id*. at 43:8-17.  The run time engine is optimized by extracting from that code only the "variable definitions," "methods," "object classes," and "external file references" necessary for the particular website.  *See, e.g., id.* at Fig. 25, Blocks 163-164; *id*. at 43:8-17.  Finally, the extracted "source code is compiled with the necessary class libraries" to create the "run time engine for the web site." *See, e.g., id.* at Fig. 25, Blocks 165-166; *id*. at 43:28-30 ("The customized run engine and a library of the referenced run time classes are compiled and converted into byte code at **165**.").  The resulting engine is an executable Java ".CLASS" file.  *See, e.g., id.* at Fig. 27, Block 177; *id*. at 43:28-30.

When an end-user browses to the website, she is provided with the HTML shell file, which is encoded in the HTML and JavaScript code of a conventional webpage.  *See, e.g., id*. at 45:4-43, Fig. 28.  That HTML shell file draws a background color/pattern, executes JavaScript code to determine the type and size of the user's browser, and then executes the Java-based runtime engine, which launches a Java applet within the end-user's browser.  *Id*. at 45:4-37.  The runtime engine then reads the websites attributes from a database and, using those attributes, generates within the Java applet the contents of the website.  *See, e.g., id*. at Fig. 29, 45:44-48.

### B.       The Prosecution History of the Asserted Patents

During prosecution, the application leading to the '397 patent was repeatedly rejected as anticipated by a patent to Faustini, who worked for Sun Microsystems (the company that created Java).  The Faustini patent described and claimed Sun Microsystem's own Java-based website authoring tool.  The examiner found that Faustini disclosed every element of the then-pending claims (including those XMO now attempts to characterize as "pioneering").  Ex. 3 at 2.[2]  In

---

[2] "Ex." or "Exs." refer to exhibits to the Declaration of Timothy Saulsbury in Support of Defendant's Responsive Claim Construction Brief.

response, the applicant amended the claims to add the concept of a "virtual machine." *See, e.g.,* ECF No. 78-8 at 2.  But this amendment was found to be inadequate because Faustini also used a JVM.  *See* Ex. 4; Schmandt Decl. ¶ 5.

In response to this second Faustini rejection, the applicant amended his claims again, this time with language requiring that the claimed "run time file" use "information stored in" a "database" to "generat[e] the display" of at least a portion of a webpage.  ECF No. 78-4 at 10.  In connection with this amendment, the applicant argued that Faustini differed from the amended claims because "the web pages generated by Faustini result from a Faustini run time engine" that contains "*all* of the information necessary to generate a display" of the webpage, whereas the "claimed invention generates web pages using two features":  a "run time engine" (like Faustini) and "a database of user settings."  *Id*. at 5.[3]

The applicant explained that this configuration gave his invention two advantages over Faustini: (1) by storing the user settings separately in a database, the invention resulted in "a smaller 'footprint' (code size which is transmitted for display over a communication system)"; and (2) that "changes to code during production are more easily implemented."  *Id*.  With respect to this second benefit, the applicant explained that, by "stor[ing] the attributes of the display separately from the run-time code," the "user of the ***claimed invention***" may "change the attributes of the web page without requiring ___re___compilation of the run-time code."  *Id*.  In other words, if the invention stored attributes in its run time engine—as Faustini did, and instead of in a database—then the invention's (previously compiled) run time engine would have to be "___re___compiled" when those attributes were changed.  *Id*.

### C.     XMO Mischaracterizes the Nature of the Purported Invention

---
[3] Emphasis supplied and internal citations and quotations omitted unless otherwise noted.

XMO tries to paint the asserted patents as "pioneering," "creat[ing] a new paradigm," and providing a "completely unconventional way of creating and rendering web pages." ECF No. 78 ("XMO Br.") at 2.   To support these characterizations, Plaintiff relies exclusively on the applicant's own descriptions of the invention and on the declaration of its expert, Mr. Andre Krueztfeldt—and downplays the fact that the applicant's *sole* basis for distinguishing Faustini was the use of a database to store user settings.  *See id*. at 2-6.

Indeed, as Mr. Krueztfeldt acknowledged in his deposition, his opinions about the patent's novelty did not accurately reflect the state of the art because, in rendering those opinions, he failed to consider all of the available prior art and instead focused on how the claims were different from the specific prior art "examples" described in the patent.  Ex. 1 at 155:11-156:17.  For instance, although Flash-based web content was pervasive as of the filing date of the asserted patents—and Mr. Krueztfeldt was familiar with Flash because he personally worked on that product while employed at Adobe—he "didn't apply that knowledge when writing" his "declaration."  *Id*. at 155:11-156:5.  When asked to confirm that his declaration's statements about the prior art fail to "capture what was available as a matter of Flash," Mr. Krueztfeldt flatly admitted:  "*I did not consider Flash in the moment of writing my opinions.  So that's the reason why it's not there.  I didn't consider it*."  *Id*. at 156:6-17; *see also id*. at 186:21-187:10 ("I *never in my declaration thought about Flash*.").  Elsewhere, Mr. Krueztfeldt failed to account for Java applets, which indisputably were in widespread use at the time:

> Q. Okay. So where you say that rendering was done only inside the HTML browser via built in HTML engine possibly and a JavaScript add-on that's incomplete because it *doesn't include Java applets* and Flash; that is correct?
> A. That's correct.

*Id*. at 142:19-24.

And, when prompted to consider Flash, Mr. Krueztfeldt straightforwardly acknowledged

that it *was* used to deliver non-HTML encoded web content—using an HTML shell file, run time

file, and settings—like the method claimed by the asserted patents:

> Q. In other words, it would be possible to present an entire web page within a
> Flash player residing within a browser?
>
> A. More correctly on this one, you would have an HTML page, that's presented to
> the browser that would call the Flash player in and totally to take over the whole
> canvas. And then Flash components -- like the button, which is the Flash-specific
> button, would be rendered on that and it would be a presentation to the user and
> given the experience that, Oh, this is the web page, which in fact does not -- it is
> one web page but it actually -- but you actually see is Flash.
>
> Q. *Similar to how the XMO patents describe presenting a Java-based website*
> *within an HTML shell file; correct?*
>
> A. *Similar to what the Express Mobile invention says about the Java virtual*
> *machine, the run time file and the settings all done together like Flash* -- you
> need more than just the virtual machine, *all of that together would be similar to*
> *what Flash would have done*.

*Id*. at 147:5-148:5.   Mr. Krueztfeldt also acknowledged that, contrary to his declaration's

descriptions of the state of the art, Flash "allow[ed] you to develop a Flash-based web

environment **with a what you see is what you get interface**," *id*. at 154:19-155:6 ("But **definitely**

**for Flash, that's true**.").   Moreover, unlike the traditional HTML/JavaScript examples he

considered, Flash wasted no more space than, and involved the same access times as, the

implementation of the XMO patents because "the Flash code" was "already compiled and [in]

the minimized form" for it "to be played on a target" machine.  *Id*. at 159:3-162:19.

Finally, although XMO asserts that its "patented ideas were widely adopted through the

implementation" of a standard called "HTML5"—citing only Mr. Krueztfeldt's declaration as

support—Mr. Krueztfeldt acknowledged that HTML5 lacks features central to the asserted

patents, including a "virtual machine" and a "runtime engine."  *Compare* ECF No. 87 at 5 *with*

Ex. 1 at 188:22-189:3 ("Q. What is the virtual machine in HTML 5?  A. HTML 5 does not have

virtual machine."); *id*. at 189:13-16 ("HTML 5 does not have the concept of a runtime engine.");

*id*. at 192:8-21 ("Q. Now, does HTML 5 make use of a runtime engine, as that term is defined

under Express Mobile's proposed construction?   A. HTML 5 does not have such a file."). Notably, although XMO purports to be a practicing entity that "develops browser-based and native application publishing platforms," it *too* does not practice the supposedly "paradigm[atic]" inventions of the asserted patents that XMO claims "were widely adopted" as "the industry standard for web development and browser functionality."  ECF No. 78 at 2, 5; Ex. 5 at 4.

## II.    ARGUMENT

### A.    Disputed Terms of the '397 and '168 Patents

#### 1.    "virtual machine": Claims 1, 2, 9, & 37 of '397 patent

| Express Mobile's Proposed Construction | BigCommerce's Proposed Construction |
|---|---|
| an abstract machine that is not built in hardware  but is emulated in software | software that emulates a hypothetical computer and runs compiled code |
| | *or:*  software that emulates a hypothetical computer and executes intermediate code in the instruction set of that hypothetical computer |

The parties' central dispute is whether a virtual machine can (as XMO would have it) interpret and execute human-readable markup and scripting languages (like HTML and JavaScript) or whether (as BigCommerce contends) it must execute code converted into the appropriate intermediate code for the virtual machine.   Specifically, XMO's proposed construction is designed to support its infringement contentions, which attempt to read the term "virtual machine" to include a "browser engines [that] interpret and execute JavaScript and HTML to render webpages on a computer."  *See, e.g.,* Ex. 6 at 2.  The Court should not allow this move.  As noted above, the asserted patents (and XMO's opening brief) expressly disparage webpages encoded in JavaScript and HTML and rendered by a browser.  *See, e.g.,* '397 patent at 1:11-21; ECF No. 78 at 2-6.  Indeed, according to the specification, the ***entire point*** of the invention was to improve upon systems that operated on HTML and JavaScript by using a virtual machine that operated using a "full featured" coding language.  *See, e.g.,* '397 patent at 1:11-3:6.

BigCommerce's initial construction reflected this point by specifying that a "virtual

machine" runs compiled code—*i.e.*, full-featured code compiled into the appropriate intermediate code of the virtual machine, such as the Java bytecode of the virtual machine of the patents' embodiments.  This was, and is, a proper construction.  However, during his deposition, XMO's expert took the position that some of the ways of generating the code executed by a virtual machine were not properly labeled "compiling."  *See, e.g.*, Ex. 1 at 125:16-21 (asserting that, instead of using a software compiler, a human could "effectively be operating as the compiler" by "transcrib[ing]" into the "bytecodes" executed by the virtual machine).  Instead, he referred to the code consumed by a virtual machine as an "intermediate representation," which reflects the fact that the code executed by a virtual machine sits between the source code in which the program originally is written and the machine code of the physical machine on which it is ultimately run.  *See, e.g., id.* at 59:12-21; Schmandt Decl. ¶17.  Put differently, XMO's expert referred to the code which a virtual machine runs with reference to ***what*** it is (intermediate code), rather than ***how*** it is produced (compilation).  Because this sematic distinction makes ***no difference*** to the conceptual point BigCommerce seeks to capture in its construction (*i.e.*, that virtual machines consume code converted—whether via compilation or other means—into an intermediate representation specific to that virtual machine, and not simply human-readable markup or scripting language) we have proposed an alternative construction which is conceptually the same as our original one, but adopts Mr. Kruetzfeldt's preferred terminology.

Using Mr. Kruetzfeldt's terminology, the dispute presented by the parties' constructions is whether the concept of a "virtual machine" requires executing an intermediate form of the code written in the instruction set of the virtual machine, or whether ***any*** software executing ***any*** code (including human-readable source code) constitutes a virtual machine.  Specifically, although XMO's proposed construction pays lip service to ***some*** of the elements of a virtual

machine, its construction elides a defining element of a virtual machine—namely, that a virtual machine executes what's known as "intermediate representation" in the instruction set of the virtual machine.  As noted above, this much is clear from Plaintiff's infringement contentions, which attempt to stretch the concept of a virtual machine onto "browser engines" that "interpret and execute," not any "intermediate representation" of a virtual machine, but HTML and JavaScript *source code*.  *See, e.g.,* Ex. 6.  Significantly, not only would Plaintiff's proposed construction ensnare the prior art, but Plaintiff's own expert agrees with BigCommerce that a "virtual machine *necessarily* has an intermediate representation because that *intermediate representation is the instruction set for that virtual machine*."  Ex. 1 at 68:13-17.

Although the Court is familiar with virtual machines, some background is helpful to elucidate the parties' current dispute.  At the outset, both parties' constructions recognize that, in the context of the asserted patents, a "virtual machine" emulates, not a "*real* machine" (*i.e.,* a computer having actual, physical hardware, such as an Intel x86 processor), but an "*abstract*" or "*hypothetical*" machine.  Schmandt Decl. ¶ 6; *see* Ex. 1 at 209:16-210:1 (testifying that software for emulating a real computer, such as PowerPC processor, on the architecture of a *different* real computer would be called "an emulator," not a virtual machine).  It also is undisputed that, for a virtual machine to be operable, it must contain what is called an "instruction set."  *See* Ex. 1 at 120:8-121:8; Schmandt Decl. ¶ 7.  An instruction set is a set of all of the commands that can be recognized by—and executed by—a computer.  Schmandt Decl. ¶ 8.  In the case of a real machine, the instruction set takes the form of a "machine code" designed to be understood and executed by a processor having a specific hardware configuration, called an "instruction set architecture."  Schmandt Decl. ¶ 9; Ex. 1 at 208:8-11.  For example, the majority of personal computers are based on an Intel x86 instruction set architecture and have what are called x86

processors.  Schmandt Decl. ¶ 10.  For software to run on such computers, it must be converted into machine code in the x86 instruction set.  *Id*. at ¶ 11.  In contrast, the majority of smartphones are based on an ARM instruction set architecture and have what are called ARM processors.  *Id*. at ¶ 12.  For software to run on such smartphones, it must be converted into machine code in the ARM instruction set.  *Id*. at ¶ 13.  ARM instruction set machine code is not compatible with, and cannot be natively executed by, x86 processors, and *vice versa*.  *Id*. at ¶ 14.

It is undisputed that, like real machines, virtual machines also have an instruction set.  *See* Ex. 1 at 208:8-16 (testifying that, in the case of a virtual machine, it "processes its own instruction set").  For instance, it is undisputed that the JVM of Faustini and every embodiment of the asserted patents use an intermediate "Java bytecode" representation in the instruction set of the JVM.  Schmandt Decl. ¶ 15; Ex. 1 at 120:8-16; 238:4-7.  Thus, for software to execute on a JVM, that software must necessarily be converted (*e.g.*, from Java programming language source code) into an "intermediate representation" in the instruction set of the JVM, *i.e.*, Java bytecode.  Schmandt Decl. ¶ 16.  The representation is "intermediate" because, in order for the software to ultimately be executed, it must be converted once more (by the JVM) into the machine code of the underlying real computer on which the JVM is running.  Schmandt Decl. ¶ 17; Ex. 1 at 68:5-17 *and* 117:13-18; ECF No. 78-5 at 9:25-27 ("Java source is compiled into ***bytecodes in an intermediate form*** instead of machine code (like C, C++, Fortran, etc.) to enable and facilitate portability.").  Thus, having an intermediate representation in the instruction set of the virtual machine is inherent in the concept of a virtual machine.  Schmandt Decl. ¶¶ 19-20.  Indeed, Plaintiff's expert ***agrees*** with BigCommerce that a "virtual machine ***necessarily*** has an intermediate representation because that ***intermediate representation is the instruction set for that virtual machine***."  Ex. 1 at 68:13-17; *id*. at 129:12-17 (testifying that, "[w]ith respect to

*virtual machines in general*, it's necessary to translate from source code into some sort of intermediate representation that constitutes the instruction set for the virtual machine").

### 2. "runtime engine": Claim 1 of '168 Patent

| Express Mobile's Proposed Construction | BigCommerce's Proposed Construction |
|---|---|
| a file that is executed at runtime that facilitates retrieval of information from the database and generates commands to display a web page or website | a file containing compiled code that, when executed, generates virtual machine commands to dynamically produce a web page |

The party's central dispute with respect to "runtime engine" is whether it must contain compiled code.  Here, the applicant's own statements throughout the intrinsic record leave no question that the "runtime engine" necessarily must be compiled.

In particular, the applicant's arguments to the examiner to overcome Faustini necessarily require that the "runtime engine" of the asserted patents is compiled.  Specifically, in response to a final rejection based on anticipation by Faustini, the applicant amended the claims to make clear that the "run time file" of the invention used "information stored in" the claimed "database" to "generat[e] the display" of at least a portion of a webpage.  ECF No. 78-4 at 10.  In connection with this amendment, the applicant argued that Faustini differed from the asserted patents because "the web pages generated by Faustini result from a Faustini run time engine" that contains "*all* of the information necessary to generate a display" of the webpage, whereas the "claimed invention generates web pages using two features":  a "run time engine" (like Faustini) *and* "a *database* of user settings." *Id.* at 5.  The applicant explained that there were two benefits of this claimed configuration over Faustini: (1) that it resulted in "a smaller 'footprint' (code size which is transmitted for display over a communication system"; and (2) that "changes to code during production are more easily implemented." *Id.*  With respect to this second benefit, the applicant explained that, by "stor[ing] the attributes of the display separately from the run-time code," the "user of the *claimed invention*" may "change the attributes of the web page without requiring __re__compilation of the run-time code." *Id.*  In other words, if the invention stored

attributes in its run time engine—as Faustini did, and instead of in a database—then the invention's run time engine (which already had been compiled) would have to be "***re***compiled," resulting in an additional step to implement changes.  *Id*.

Significantly, if (as XMO now contends), the invention's "runtime engine" were not compiled to begin with, these representations to the examiner would make no sense.  ***First***, as a straightforward matter of linguistics, the use of the "re-" prefix—connoting the act of compiling the runtime engine ***again***—would make no sense if the invention's runtime engine were not compiled to begin with.  ***Second***, unless the invention's runtime engine were compiled to begin with, it would be unnecessary as a technical matter to store attributes of the webpage in a database to avoid having to ***re***compile the run time code.  *See* Schmandt Decl. ¶ 22.  That is because, if the runtime engine were ***not*** compiled (*i.e.*, if it were in the form of human-readable text because it had not been compiled into object code), one could revise website attributes stored in the invention's runtime engine just as the applicant describes making changes to such attributes in the database.  *See id*.  And, if that were true, storing attributes in a database would be entirely unnecessary to obtain the benefit of easy code changes, contrary to the applicant's representations to the examiner.  *Id*.  Put simply, that the runtime engine of the asserted patents contains compiled code necessarily follows, as a matter of linguistics and as a technical matter, from the applicant's representations to the examiner in his attempt to distinguish Faustini.

Plaintiff refuses to actually grapple with the plain import of this disclosure, instead asserting only that the applicant's remarks in distinguishing Faustini made clear that the invention "did not hinge on the type of code inputted to the virtual machine," referencing the fact that information from a database can be used by the runtime engine to generate a display.  ECF No. 78 at 20.  But, whether the runtime engine can use information from a database says nothing

about whether the runtime engine itself must be compiled.[4]   And, Plaintiff's expert agrees that

the reference to "recompilation" of the code means the runtime engine must have been compiled

in the first place.  Ex. 1 at 246:18-247:7.  Consistent with this understanding, Plaintiff's expert

could not identify a single embodiment of the invention in which the runtime engine does ***not***

contain compiled code.  *See id*. at 254:1-9.  In fact, when asked to confirm that "every reference

to a runtime engine in the '397 patent makes clear that the runtime engine does in fact contain

compiled code," Mr. Kruetzfeldt replied:  "***I think we established in the prior discussion that

the runtime engine is compiled***."  *Id*. at 254:10-18.  And, indeed, the patent's description of the

process for generating the invention's "customized and optimized run time engine" states that the

"customized run engine and a library of the reference run time classes are ***compiled*** and

converted into byte code at **165**," resulting in the creation of the "run time engine for the web

site" at **166**.  *See* '397 patent at 43:8-31 (citing Fig. 25).

Finally, Plaintiff's assertion that BigCommerce's proposed construction would

"effectively exclude one of the preferred embodiments" is readily be rejected.  ECF No. 78 at 20.

Plaintiff does not actually identify any embodiment that would be read out of the patent, but

suggests that a compiled runtime engine would somehow ***indirectly*** limit the scope of the

---

[4] Plaintiff does not argue that the applicant's arguments in distinguishing Faustini fall short of a
"clear and unmistakable" disclaimer and thus cannot support BigCommerce's proposed
construction, *see* ECF No. 78 at 19-20, and Plaintiff should not be permitted to raise such an
argument for the first time in reply.  Even if Plaintiff ***had*** made such an argument, it would be
wrong.  It is well-established that "the prosecution history can often inform the meaning of the
claim language by demonstrating ***how the inventor understood the invention***," even where the
applicant's statements fall short of disclaimer.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317
(Fed. Cir. 2005); *Nystrom v. Trex Co.*, 424 F.3d 1136, 1142-46 (Fed. Cir. 2005) (holding that
whether statements during prosecution amounted to disavowal was immaterial because the
statements demonstrated that the patentee understood the term to be limited to wood cut from a
log).  *Id*. at 1144-45; *see also AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380
(Fed. Cir. 2005).

"virtual machine" term since one "skilled in the art would understand that the run time engine is one of the run time files input into the virtual machine." *Id*. But, Plaintiff's argument fails as a matter of logic. Even if Plaintiff were right that "many virtual machines read and process code and data whether that code is 'compiled' code or differently constructed," no virtual machine embodiments would be ***excluded*** by the fact that compiled runtime engine code is input into such a machine. That is because, as Plaintiff acknowledges, virtual machines are capable of processing compiled code (and thus a runtime engine containing compiled code)—even if Plaintiff is right that virtual machines ***also*** can process code that is not compiled.

### 3.    "substantially contemporaneously": Claims 1 & 2 of '397 patent

| Express Mobile's Proposed Construction | BigCommerce's Proposed Construction |
|---|---|
| substantially in the same time period, from a human perspective | happening at the same period of time from a human perspective |
| | ***otherwise***: indefinite |

"Substantially contemporaneously" is a term of degree. "When a word of degree is used[,] the district court must determine whether the patent's specification provides some standard for measuring that degree." *Evicam Int'l, Inc. v. Enf't Video, LLC*, No. 4:16-CV-105, 2016 WL 6470967, at *19 (E.D. Tex. Nov. 2, 2016) (finding indefinite the claim term, "prevent said data from being overwritten for ***extended*** periods of time"). Put differently, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (holding indefinite the phrase, "unobtrusive manner"); *Advanced Display Techs. of Texas, LLC v. AU Optronics Corp.*, No. 6:11-CV-011, 2012 WL 2872121, at *15 (E.D. Tex. July 12, 2012) ("Claim 1 of the '664 patent is indefinite because the claims and specification fail to provide an ***objective standard*** to determine whether a bump is 'smooth.'").

The intrinsic record says that substantially contemporaneously must be measured from a human perspective ***and*** that—from that perspective—the two events must occur at in ***real time***:

14

> A polling loop is defined in the panel's (panel 400) JavaScript that creates a near continuous, at least from a human perception point of view, dynamic ***real time*** link, in order to monitor events occurring inside the build engine. The result is a ***real time retrieval (from an ergonomic perception point of view)*** of necessary data and status settings from the build engine back to the interface.

'397 patent at 23:21-27.  As this passage explains, the change to the setting and the resulting change to the display must happen in ***real time*** from the point of view of human perception. Big Commerce's construction is faithful to this idea because it says that the term means that the change and display must happen "at the same period of time from a human perspective."[5]  Both the specification and BigCommerce's construction recognize that computers and humans measure time differently (because computers operate in time frames that are imperceptibly fast relative to human cognition) and that "substantially contemporaneously" is intended to indicate that the two events must happen at the same time from the human perspective, even if they happen at times that are not contemporaneous from the computer's frame of reference.

XMO agrees that "human perception" is important to the understanding of this term, but ignores the fact that the two events must happen ***in real time*** from that perspective.  Instead, XMO simply copies the word "substantially" from the claim term into its construction ***instead of*** providing a way to know whether that "word of degree" has been satisfied.  XMO does this because it wants to argue to the jury that two events which happen at ***different*** times (even from a human perspective) satisfy the claim limitation.  Thus, for example, in his deposition, XMO's expert opined that, under XMO's construction, the term requires only "some form of updating as changes are made to a web page during creation or editing." Ex. 1 at 259:3-21. But—as anyone who has ever written or edited a brief can attest—the process of "creating or editing" a document (of which a web "page" is just one variety) can take a very long time.  In short, XMO is asking

---

[5] "In real time from a human perspective" would be an equally appropriate construction.

the Court to construe the term "substantially contemporaneously" *without* providing any guidance as to what "substantial" means or how it would be judged, so that its expert can turn around and argue to the jury that *any* period of time satisfies the limitation so long as the change and the update both happen "during creation or editing" of the web page.

Indeed, when he was asked whether a five-minute delay would qualify as "substantially contemporaneously" under his approach, XMO's expert repeatedly declined to answer while claiming that he simply "hadn't thought about it."  *See* Ex. 1 at 263:22-266:1.  Even so, he was ultimately forced to acknowledge that he could not even *identify* boundaries for how soon, after changes to a web page are made, updates must occur in order to be considered "substantially contemporaneously."  *See id*. at 268:3-10 ("Q: In looking at the claims and having read the patent, sitting here today, you can't identify a period of time that would fall within the scope of substantially contemporaneously?"  "THE WITNESS: Not at this moment in time.").

The reason he was unable to perform this task is because XMO's approach to this claim term (*i.e.*, that "substantially" should just be carried through from the claim into the construction without explanation so that its expert can "interpret" the construction to include any time "during creation or editing") conflicts with both the intuitive meaning of the term *and* the objective standard imparted by the specification.  Indeed, XMO's approach takes the notion that two things should happen in *real time* from a human perspective, and changes it to one in which the two things must only happen during some (temporally unbounded) "creation or editing" process.

Another way to see this is by noting that XMO's proposed construction makes the term indefinite.  The case law on words of degree is clear that those terms must be construed so that their meaning is not simply up for grabs.  *See Interval*, 766 F.3d at 1371 ("[T]here is an indefiniteness problem if the claim language might mean several different things and no

informed and confident choice is available among the contending definitions."). Yet, that is *precisely* what XMO's proposed construction would do—by giving the term a meaning so unbounded that even its own expert *cannot identify* which time periods fall within its scope. Put differently, XMO is trying to take a term that should be judged in terms of *time* and transform it into a term that is measured, not by time, but by whether it occurs during a creation and editing process that can take *any* length of time.

The Court should also reject XMO's argument that "substantially" is always definite and can therefore simply be repeated as part of its own construction. The cases on which XMO relies stand for no such thing. Indeed, *none* of those cases held that "substantially" is definite standing alone, or that, despite being a word of degree, "substantially" is inherently definite and the jury need not be given any way to judge whether it has been satisfied. For example, *Interval* held that for terms of degree to be definite the intrinsic record "must provide objective boundaries for those of skill in the art." *Interval*, 766 F.3d at 1371. Similarly, *One-E-Way* found the term, "virtually free from interference," to be definite only after identifying objective boundaries in the claims and specification. *See One-E-Way v. Int'l Trade Comm'n*, 859 F.3d 1059, 1066 (Fed. Cir. 2017). And in *Eibel Process Co. v. Minn. & Ont. Paper Co.*, 261 U.S. 45, 65-66 (1923), the Court found the term "substantial" not indefinite because the intrinsic record showed that "the improvement indicates an angle of 4 per cent., or an elevation of 12 inches[.]" *Id.* at 65. Thus in each case, there were objective boundaries from which the scope of the term could be judged.

Finally, it is well-established that constructions that simply take words from the claim term and repeat them are disfavored. *See, e.g.*, *RLIS, Inc. v. Allscripts Healthcare Solutions, Inc.*, No. 3:12-CV-208, 2013 WL 3772472, at *4 (S.D. Tex. July 16, 2013) ("Repeating words in the construction that are already included in other parts of the claim language—in this instance,

just a few words away—is unnecessary and confusing."); *Konami Corp. v. Roxor Games, Inc.*, 445 F. Supp. 2d 725, 733 n.7 (E.D. Tex. 2006); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1566 (Fed. Cir. 1997). Where, as here, the term is one of degree **and** the patent's specification is clear that events happen substantially contemporaneously when they occur in real time from a human perspective, the term should not simply be repeated in its own construction.

### 4.      "contemporaneously": Claim 37 of '397 patent

| Express Mobile's Proposed Construction | BigCommerce's Proposed Construction |
| --- | --- |
| in the same time period of time from a human perspective | happening at the same period of time |

Unlike the related term "substantially contemporaneously" this term contains no word of degree and can therefore be construed without reference to a particular standard from which to judge its boundaries. It can, in other words, be given its ordinary meaning.

The parties do not appear to materially dispute the term's basic meaning—*i.e.* that "contemporaneously" means that two things happen "[in/at] the same period of time." *See* Ex. 7. Indeed, Express Mobile acknowledges that the parties' proposed constructions "largely track[]" one another, and are "derived from similar resources." XMO Br. at 21. The difference is, of course, that Express Mobile's construction adds the phrase "from a human perspective." The **reason** Express Mobile has added this phrase is so it can argue that the word "substantially" (in the preceding claim term) does not imply evaluation from a human perspective and instead connotes some other (undefined and indefinite) temporal flexibility.

To support its attempt to mandate a particular perspective not required by the term's ordinary meaning, Express Mobile asserts that "the patentee has acted as his own lexicographer for this term." XMO Br. at 22. Not so. To act as lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The passage

to which Express Mobile points does not even purport to define the term.  This conclusion is further supported by the fact that the patentee did act as his own lexicographer for *other* terms in the specification.  *See Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) *and* '397 patent at 35:47-50 ("A transformation is defined as the changing of an object from one state to another based on a timer control, subject to user settings.").

Express Mobile also argues that its construction is compelled by "common sense"—*i.e.* that the Court should adopt its construction because the "relevant feature here is the user's experience."   Brief at 22.   This argument lacks foundation.   BigCommerce's proposed construction does not define the term "contemporaneously" to *exclude* a user's perspective. Instead it simply says (in line with the ordinary meaning of the term) that two events are contemporaneous when they happen at the same period of time—which is what *both parties* agree is the ordinary meaning of contemporaneously.   The Court should not allow Express Mobile to use purported "common sense"—untethered from any intrinsic or extrinsic evidence— to read additional limitations into the meaning of an ordinary English term.

Express Mobile also argues that BigCommerce's argument should be rejected because it "could, arguably, restrict the claims to implementations where the screen update occurs virtually instantly, within a few clock times of the processor" and thereby "reads out" preferred embodiments.  XMO Br. at 23.  This is wrong.

*First*, the vast majority of the '397 patents' claims contain a "substantially contemporaneously" limitation, not the "contemporaneously" limitation found in Claim 37.  This is important because the Court's task in claim construction is not simply to interpret the disputed claim terms in isolation, but with a view to how they relate to each other.  The most logical way to read the difference between "contemporaneous" and "substantially contemporaneous" is to

read the latter as including times that wouldn't (strictly speaking) fall within the former.  And that is what BigCommerce's proposal does—*i.e.*, it interprets "contemporaneous" as meaning the *same* period of time, and it interprets "substantially contemporaneous" as including things that are *not* (strictly speaking) in the same period of time but are nevertheless *close enough* to be perceived as contemporaneous by a human being.   Express Mobile, in contrast, defines "contemporaneous" as meaning *close* in time from a human perspective, fails to provide any construction for "substantially" and then puts its expert up to *argue* that "substantially" makes the overall phrase broad enough to sweep in any two events which happen "during drafting or editing" a document.  Of these two approaches, only BigCommerce's comports with the overall structure of the claims and the specification, and avoids the indefiniteness that simply repeating "substantially" in its own construction would otherwise create.

*Second*, there is nothing in BigCommerce's proposal that requires the two events to happen "virtually instantly" or purports to define "contemporaneous" in terms of a particular number of clock cycles.  And, even if the construction *did* result in the exclusion of a particular embodiment, that would not be a reason to depart from the ordinary meaning of the claim language.  Indeed, the canon that constructions should not exclude the preferred embodiment, "does not mean . . . that each and every claim ought to be interpreted to cover each and every embodiment."  *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) ("It is not necessary that each claim read on every embodiment.")).  That is especially true where, as here, there is *no dispute* that the majority of the claims use the term "substantially contemporaneous" and that *these claims* cover embodiments in which the adjustment and resulting display no not happen during the *same* period of time.  The Court should, therefore, adopt BigCommerce's proposed construction.

5.       "multidimensional array": Claims 3 & 4 of '397; Claim 1 of '168

| Express Mobile | BigCommerce's Proposed Construction |
| --- | --- |
| an indexed set of related elements, wherein each element is addressed by a set of two or more indices | an indexed set of related elements, wherein each element is addressed by an expression consisting of the array name followed by a set of two or more indices, each index corresponding to a dimension of the array<br><br>*or*: an indexed set of related elements wherein each element is addressed by a unique identifier and a set of two or more indices, each index corresponding to a dimension of the array |

The parties' central dispute is whether a multidimensional array must be addressed with *some* form of unique identifier corresponding to that array, or whether such an array may be addressed only with a set of indices.  BigCommerce originally incorporated this concept by proposing a construction requiring that the expression for addressing the array contain an "array name followed by a set of two or more indices."  Although BigCommerce never intended to limit the "name" of the array to any particular format, it became clear during the deposition of Plaintiff's expert that he understood "array name" to require that the unique identifier for the array be in the form of a human-readable text string, and on that basis disagreed with BigCommerce's proposed construction.  Ex. 1 at 86:11-16.  He also took issue with the reference to an "expression" in BigCommerce's construction, which he likewise understood to require a *particular* way of addressing the array.  *Id*. at 85:19-86:1.  To address these concerns, BigCommerce refined its construction to eliminate the semantic disputes concerning "expression" and "array name" by replacing that language with the notion that the array is addressed by a "unique identifier" and "a set of two or more indices, each index corresponding to a dimension of the array."  *See id*. at 273:2-274:18.  Mr. Kruetzfeldt was asked whether he believed that the reformulated construction "exclude any arrays available to a PHOSITA at the time of the XMO invention," but was unable to identify any such arrays.  *Id*.

XMO's proposed construction, on the other hand, should be rejected because it omits the requirement that the addressing means for the array contain some sort of identifier for uniquely

differentiating that array from another array.  A PHOSITA reading the claims in light of the intrinsic record would understand that the addressing mechanism necessarily must contain a unique identifier for the array because, otherwise, the logic addressing the array would not be able to distinguish between the array it seeks to access and some other array.  Schmandt Decl. ¶ 24.  Because XMO's construction omits this necessary element, it should be rejected.

### 6.    "database": Claims 1-3, 9, & 37 of '397 patent; Claim 1 of '168 patent

| Express Mobile's Proposed Construction | BigCommerce's Proposed Construction |
|---|---|
| an electronic information storage system offering data storage and retrieval | a file composed of records, each containing fields together with a set of operations for searching, sorting, recombining, and other functions |

The parties' central dispute is whether (as BigCommerce proposes) a database is a file having structure (*i.e.*, records with fields) and a set of operations, or whether "database" refers to *any* means for storing electronic information, so long as that information may be retrieved.

The intrinsic record does not provide a definition for database, and both parties adopt their constructions from dictionary definitions.  BigCommerce's proposed construction adopts *verbatim* the definition of "database" from the contemporaneous edition of the Microsoft Computer Dictionary—a dictionary widely relied on by Courts as reliable extrinsic evidence in cases involving computer technology.[6]  XMO, in contrast, adopts its proposed construction from an obscure dictionary—the "Dictionary of Multimedia and Internet Applications"—that, from what counsel can gather, courts apparently never have relied on.  Worse yet, XMO cherry-picks only a portion this dictionary definition and *omits* the remaining text, which—like BigCommerce's construction—recognizes that a database a database has a particular organizational structure that involves storing information on a "records, each containing fields."[7]

---

[6] *See, e.g., Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1376–77 (Fed. Cir. 2003); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007).

[7] The Federal Circuit has cautioned against precisely this approach—*i.e.* providing a definition

*See* ECF No. 78-20 at 3.  Specifically, the portions of XMO's own dictionary definition omitted from its construction specify, just like the Microsoft dictionary, that the term database "describes the storage of information on a ***record by record basis***" and that these "[r]ecords are divided into ***fields***."  *Id*.  In short, when considered in their entirety—as they must be—the parties' respective dictionary definitions both make plain that (as reflected in BigCommerce's construction) a database necessarily is "composed of records, each containing fields."

Although XMO's own dictionary definition, standing alone, establishes that its proposed construction is unduly broad, XMO's construction must be rejected for many additional reasons.

***First***, Express Mobile's proposed construction is so broad that it encompasses structures that no layperson—let alone a skilled artisan—would call a "database."  Indeed, because it provides no details concerning ***how*** data is stored, Plaintiff's proposed construction of "an electronic information storage system offering data storage and retrieval" would encompass virtually ***any*** electronic data storage media and ***any*** electronic file.  Schmandt Decl. ¶ 26.  A CD-ROM is an "electronic information storage system," and it offers "data storage and retrieval": one can write to and read from a CD-ROM.  *Id*.  The same is true of flash media, spinning disk hard drives, SSDs, a server, tape media, and virtually all other forms of electronic storage media. *Id*.  Significantly, XMO's own expert was unable to "identify ***anything*** within XMO's proposed construction that excludes CD-ROMs," "flash media," or "any other data storage media."  Ex. 1 at 280:9-281:8.  XMO's proposed construction also impermissibly encompasses virtually ***any*** electronic file.  Schmandt Decl. ¶ 27.  For instance, the Microsoft Word file in which this brief was saved, is an "electronic information storage system":  it electronically stores information (a

---

that is simply ***part of*** the definition found in an extrinsic source.  *See, e.g.*, *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1180 (Fed. Cir. 2009) (rejecting proposed construction based on "misleading dictionary definition" that excerpted just a portion of dictionary definition).

representation of the text and formatting of the document) in a "system" (the .docx format is a standardized system for representing the content of word processing documents).  *Id.*  And, this brief's Word file "offers data storage and retrieval":  one can "store" text and formatting data in it, and one can "retrieve" the same, by *e.g.*, opening the file in Microsoft Word.  *Id.*  Yet, no skilled artisan would consider a Microsoft Word document to be a "database."  *Id.*

*Second*, Express Mobile's proposal is foreclosed by the intrinsic record because it would ensnare the prior art.  Specifically, as noted above, the applicant's *sole* basis for distinguishing Faustini is that, unlike Faustini (in which, according to the applicant, the run time engine contains "*all* of the information necessary to generate a display" of the webpage), the invention of the asserted patents "stor[es] the attributes of the display" in a "database."  ECF No. 78-4 at 5.  Yet, Plaintiff's virtually unbounded construction of "database" eviscerates this distinction of Faustini because a runtime engine indisputably is an electronic computer file and thus is an "electronic information storage system offering data storage and retrieval" and, thus, fits XMO's definition of a "database."  Indeed, as the applicant himself asserted, all of the attributes of the Faustini webpage were "stored" in the runtime engine, and they necessarily were "retrieved" in order to generate a display of the webpage.  *Id.*; Schmandt Decl. ¶ 28.  Because Plaintiff's proposed construction would impermissibly ensnare Faustini, it must be rejected.

*Third*, the remainder of the intrinsic record supports BigCommerce's proposed construction.  The '397 patent's specification explicitly contemplates a build engine that maps to a database with "a *full array* of database operations."  '397 patent at 33:27-34.  Indeed, the specification discloses that, in one implementation, support for popular database systems, "such as Oracle, Informix, Sybase, and DB2" is "available on a real time interactive basis."  *Id.*  These disclosures favor a construction of "database" that, like BigCommerce's, incorporates files and

complex database operations.  Further, Figure 29 of the specification identifies "header *records*" and "styles *records*," respectively, at 187 and 188.  *Id.*  BigCommerce's proposed construction incorporates the concept of records and therefore tracks the specification of the '397 patent. Moreover, the portions of the specification on which Express Mobile relies in fact *undermine* its construction.  For example, Express Mobile relies on the specification's statement that, "[a] run time generation procedure *creates* a compressed program customized run time engine file, with *an associated database*[.]"  XMO Br. at 28.  That language explains that the database is *created by* the "run time generation procedure."  A "run time generation procedure," however, is software and is thus incapable of generating the *physical* data storage media encompassed by XMO's proposed construction.

Finally, XMO's criticism of BigCommerce's construction is based on an overly narrow reading of the Microsoft definition.  Specifically, XMO criticizes BigCommerce's construction on the grounds that "not all databases of the time had the capability of 'recombining' files."  But, BigCommerce's proposed construction does not require that a "database" have such functionality.  Instead, it requires only that a database have "a set of operations *for*" the recited functionality, meaning that a database must have operations (*e.g.*, read and write operations, which XMO's own construction encompasses) sufficient for logic (which may be separate from the database) to be able to perform functions such as "recombining."

## III.  CONCLUSION

For the foregoing reasons, BigCommerce's proposed constructions should be adopted.[8]

---

[8] BigCommerce agrees with XMO that the term "multidimensional array structured database" does not at this juncture require construction beyond the separate construction of the terms "multidimensional array" and "database."  Further, BigCommerce agrees with XMO on the construction of "external database" as "a database (see separate construction of "database" term) external to the build tool."  BigCommerce, thus, does not separately address those terms here.

Dated:  December 11, 2017           DURIE TANGRI LLP

By: _____
     Clement S. Roberts (CA SBN 209203)
     Timothy C. Saulsbury (CA SBN 281434)
     217 Leidesdorff Street
     San Francisco, CA  94111
     Telephone: 415-362-6666
     Facsimile: 415-236-6300
     croberts@durietangri.com
     tsaulsbury@durietangri.com

     Amit Agarwal (CA SBN 294269)
     14420 Edinburgh Moor Dr.
     Wimauma, FL 33598
     Telephone: 310-351-6596
     ama7386@gmail.com

     Bobby Lamb
     State Bar No. 24080997
     GILLAM & SMITH, L.L.P.
     303 South Washington Avenue
     Marshall, Texas 75670
     Telephone: 903-934-8450
     Facsimile: 903-934-9257
     wrlamb@gillamsmithlaw.com

     ***Attorneys for Defendant***
     ***BigCommerce, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2017 the within document was filed with the Clerk

of the Court using CM/ECF which will send notification of such filing to the attorneys of record

in this case.

                                                    Timothy C. Saulsbury